## Commonwealth *vs.* Kenton W. Feyenord.

Worcester. May 3, 2005. - September 2, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Search and Seizure,* Motor vehicle, Threshold police inquiry, Trained dog.
*Constitutional Law,* Search and seizure, Investigatory stop. *Threshold
Police Inquiry. Controlled Substances.*

A Superior Court judge correctly denied a criminal defendant's motion to sup-
press cocaine found by the police in his motor vehicle, where the police
lawfully stopped the vehicle for a traffic violation [75] and properly ordered
the defendant to exit the vehicle [75-76]; where the defendant's extended
detention by the police for the purpose of summoning a canine unit was
reasonable and proportional to the unfolding circumstances that suggested
his involvement in criminal activity beyond the violation for which he was
initially detained [76-82]; and where the exterior sniff of the properly
stopped motor vehicle, by a dog trained in drug detection, was not a search
within the meaning of the Massachusetts Declaration of Rights [82-83];
consequently, the resulting discovery and seizure of contraband inside the
motor vehicle was proper. Greaney, J., concurring. Marshall, C.J., dissent-
ing, with whom Ireland, J., joined.
Evidence presented at the trial of an indictment charging trafficking in cocaine
was sufficient to support the jury's verdict of the defendant's guilt as a
joint venturer. [83-86]

Indictment found and returned in the Superior Court Depart-
ment on November 9, 2000.

A pretrial motion to suppress evidence was heard by *Timothy
S. Hillman,* J., and the case was tried before him.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Michael J. Traft* for the defendant.

*Michelle R. King,* Assistant District Attorney, for the
Commonwealth.

Cordy, J. A jury convicted the defendant, Kenton W. Fey-
enord, of trafficking between one hundred and 200 grams of
cocaine in violation of G. L. c. 94C, § 32E (*b*) (3). A divided

panel of the Appeals Court affirmed the conviction. *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200 (2004). We granted further appellate review, limited to consideration of two issues: the denial of Feyenord's motion to suppress cocaine found by the police in the vehicle he was driving; and the sufficiency of the evidence.[1] We conclude that the exterior sniff of a properly stopped motor vehicle, by a dog trained in drug detection, is not a search within the meaning of the Massachusetts Declaration of Rights. We also conclude that Feyenord's extended detention, after his motor vehicle was stopped for a traffic violation, for the purpose of summoning a canine unit, was reasonable and proportional to the unfolding circumstances that suggested his involvement in criminal activity beyond the violation for which he was initially detained. Consequently, Feyenord's motion to suppress was properly denied. We finally conclude that the evidence at trial was sufficient to support the jury's verdict and affirm the conviction.

1. *Motion to suppress.* We accept the motion judge's findings of fact and the undisputed evidence consistent with those findings adduced at the hearing on Feyenord's motion to suppress.[2] See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 538 (1990). On May 4, 2000, at approximately 5:45 P.M., State Trooper William Pinkes was traveling on Route 395 in Auburn when he noticed a vehicle traveling behind him with one headlight out. The weather did not require the use of headlights, and it was daylight. After Pinkes allowed the vehicle to pass his marked police cruiser, he activated the cruiser's blue lights, and the driver pulled over. Inside were Feyenord and a passenger. Pinkes approached the vehicle and asked Feyenord for his driver's license and automobile registration. Feyenord was visibly nervous, and his hands were shaking. He was unable to produce a license but did hand Pinkes a Massachusetts registration that was apparently valid but not in his name. Pinkes asked the pas-

---

[1]Given this limitation, we do not consider the challenge by the defendant to the judge's instructions to the jury on joint venture, which, the Appeals Court concluded, adequately explained the applicable law. *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 201 n.2 (2004).

[2]Feyenord makes no challenge on appeal to the judge's findings about the circumstances surrounding the discovery of drugs in the vehicle he was driving.

senger for identification, and the passenger produced a
photographic identification card from the country of Jamaica
that identified him as a Jamaican national named Junior Cox.
When Feyenord did not provide an intelligible response to
Pinkes's request for his name, Pinkes ordered him out of the
vehicle. Cox remained in the passenger seat.

Having separated Feyenord from Cox, Pinkes went back and
forth between them to ask basic questions about their identities
and destination. Standing outside the vehicle, Feyenord told
Pinkes that his name was Kadari Bowen and his birthday was
June 6, 1978. When asked his age, however, Feyenord struggled
with the answer, providing one age and then another. Feyenord
told Pinkes that Cox was his brother-in-law and the father of his
sister's child, and that he had known Cox for twelve years. Feye-
nord also said that he had a New York driver's license and he
and Cox were traveling to visit a friend in Putnam, Connecticut,
for whom he could produce neither an address nor a telephone
number. In contrast, Cox, still seated in the vehicle, told Pinkes
that he had known Feyenord for two to three years, knew him
only as "Pat," did not know his last name, and was not acquainted
with any members of his family. Cox also said that they were
headed to Brooklyn, New York.

These preliminaries lasted between five and ten minutes. At
this point, Pinkes ordered Feyenord to sit in the back seat of the
cruiser (unhandcuffed), telling him that he was not under arrest
but was not free to leave. Pinkes then radioed for assistance
from a canine officer, State Trooper James Devlin, who arrived
at the scene within fifteen to twenty minutes with a drug-sniffing
dog. Devlin proceeded to direct the dog around the vehicle. The
dog displayed a heightened interest in an area near the left rear
of the vehicle's trunk. The officers proceeded to open the trunk
and place the dog inside.[3] The dog again became excited in the
area of the trunk near the left taillight. Pinkes then searched the
trunk, discovering an access panel in the area that had caused

---

[3]The canine officer testified at the hearing on the motion to suppress that he
obtained consent from Feyenord to search the vehicle with the dog im-
mediately after the dog became agitated during the initial exterior sweep. The
judge made no finding of fact to this effect, and neither the Commonwealth
nor Feyenord suggest that consent is at issue in this case.

the dog's agitation. Once he removed this panel, Pinkes found a gray plastic bag and, within, a digital scale and small black plastic bags each containing a quantity of a substance that appeared to be crack cocaine.

a. *The traffic stop.* Feyenord first argues that the judge should have granted his motion to suppress the cocaine because the police had no justification to stop him for driving a vehicle with one inoperable headlight in daylight. We disagree. General Laws c. 90, § 7, provides that "[e]very motor vehicle operated in or upon any way . . . shall be provided with . . . suitable lamps." We interpret this language to mean that a motor vehicle's headlamps must be suitable at all times so that they are capable of being illuminated whenever road conditions might warrant.[4] Neither the time of day nor the weather conditions during the operation of the motor vehicle has any bearing on this requirement. Although some vehicles driven during daylight may have defective headlights but escape detection by police, Feyenord was nonetheless operating his vehicle in violation of the statute. Pinkes's stop of Feyenord's vehicle was lawful. *Commonwealth* v. *Santana*, 420 Mass. 205, 207 (1995), quoting *Commonwealth* v. *Bacon*, 381 Mass. 642, 644 (1980) ("Where the police have observed a traffic violation, they are warranted in stopping a vehicle").

b. *The exit order.* Feyenord next argues that the judge should have granted his motion to suppress because Pinkes ordered him to leave the vehicle without a reasonable suspicion of danger. We conclude that the exit order was proper.

Under art. 14 of the Declaration of Rights of the Massachusetts Constitution, "a police officer must, at least, have a reasonable suspicion of danger before compelling a driver to leave his motor vehicle." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 662 (1999). However, "[w]hile a mere hunch is not enough . . . it does not take much for a police officer to

[4]With specific reference to "headlamps," the statute provides that "[e]very automobile operated during the period from one half an hour after sunset to one half an hour before sunrise, and during any other period when visibility is reduced by atmospheric conditions so as to render dangerous further operation without lights being displayed, shall display at least two lighted white headlamps with at least one mounted at each side of the front of the vehicle . . . ." G. L. c. 90, § 7.

establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order." *Id.* at 664.

Here, Feyenord could not produce his driver's license, and Pinkes had been unable to ascertain his identity. *Commonwealth v. Santana, supra* at 213-214 n.8, and cases cited. Feyenord was visibly nervous and with a companion. Pinkes was alone. Although the exit order was not predicated on suspicious movements or the visible presence of a weapon or possible contraband, police officers need not "gamble with their personal safety," and the course of events after the stop sufficiently gave "rise to legitimate safety concerns" to justify the taking of the reasonable precaution of separating Feyenord from Cox and ordering Feyenord from the vehicle. *Commonwealth v. Haskell,* 438 Mass. 790, 794 (2003), quoting *Commonwealth v. Robbins,* 407 Mass. 147, 152 (1990). See *Commonwealth v. Stampley,* 437 Mass. 323, 328 (2002) ("justification for an exit order does not depend on the presence of an 'immediate threat' at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter"). The order also served a valid investigatory purpose. See *Commonwealth v. Torres,* 433 Mass. 669, 675 (2001) ("officer acted reasonably and within the limits of both Fourth Amendment and art. 14" because exit order was "no more intrusive than necessary . . . to effectuate both the safe conclusion to the traffic stop and the further investigation of the suspicious conduct"). See also *Commonwealth v. Riche,* 50 Mass. App. Ct. 830, 833-834 (2001) (exit order justified where "tender of a registration not crediting ownership of the vehicle to any occupant raised a question whether the car was stolen," and order served "special practical purpose" of "separating those in a stopped car from each other to frustrate interchange or collaboration among them"). Feyenord's claim that the fruits of the subsequent investigation should be suppressed because the exit order was unlawful is without merit.

c. *Feyenord's further detention.* Feyenord next argues that his motion to suppress should have been granted because he was unreasonably detained while the police, without reasonable suspicion of drug-related activity, summoned a canine officer

with a drug-sniffing dog to the scene, thereby impermissibly broadening the scope of the inquiry under art. 14 and the Fourth Amendment. We have not had occasion to decide what type of suspicion police officers must have to escalate a general inquiry of a motorist in connection with a violation of traffic laws to an investigation that utilizes a drug-sniffing dog and justifies the prearrest detention of a motorist for such purpose. We are, however, aided by the progeny of *Terry* v. *Ohio,* 392 U.S. 1 (1968), applicable to traffic stops and temporary detentions. *Berkemer* v. *McCarty,* 468 U.S. 420, 439 (1984) (investigative stop of a vehicle by police is "analogous to a so-called '*Terry* stop' ").

In considering the temporary detention of a motorist, we begin with the "settled principle that '[a] justifiable threshold inquiry permits a limited restraint of the individuals involved as long as their detention is commensurate with the purpose of the stop.' " *Commonwealth* v. *Torres,* 424 Mass. 153, 162 (1997), quoting *Commonwealth* v. *Ellsworth,* 41 Mass. App. Ct. 554, 557 (1996). "In evaluating whether the police exceeded the permissible scope of a stop, the issue is one of proportion. 'The degree of suspicion the police reasonably harbor must be proportional to the level of intrusiveness of the police conduct.' " *Commonwealth* v. *Sinforoso,* 434 Mass. 320, 323 (2001), quoting *Commonwealth* v. *Williams,* 422 Mass. 111, 116 (1996). In order to expand a threshold inquiry of a motorist and prolong his detention, an officer must reasonably believe that there is further criminal conduct afoot, and that belief must be based on "specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience." *Commonwealth* v. *King,* 389 Mass. 233, 243 (1983), quoting *Commonwealth* v. *Silva,* 366 Mass. 402, 406 (1974). See *Commonwealth* v. *Williams, supra* at 116 ("We view the facts and circumstances as a whole in assessing the reasonableness of the officer['s] conduct"); *Commonwealth* v. *Fraser,* 410 Mass. 541, 545 (1991) ("a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief"); *Commonwealth* v. *Wren,* 391 Mass. 705, 707 (1984), and cases cited ("A hunch will not suffice").

In this case, Pinkes conducted a threshold inquiry in which Feyenord could not produce a valid driver's license, produced a registration in another person's name, failed to identify himself, and appeared nervous. As discussed above, these circumstances justified an exit order and further inquiry.[5] After additional questioning of Feyenord and Cox, Pinkes made several decisions: (1) he chose not to arrest Feyenord, as an out-of-State driver without a license, despite having probable cause to do so, see G. L. c. 90, §§ 10, 21; (2) he focused his investigation on the possibility that the vehicle contained drugs by summoning a canine unit; and (3) he opted to detain Feyenord in the rear of his cruiser for fifteen to twenty minutes while awaiting the arrival of the canine unit.[6] Feyenord contends that this set of actions constituted a violation of his Fourth Amendment and art. 14 rights. We disagree.

In the course of questioning Feyenord and Cox about their identities and destination, Pinkes uncovered significant inconsistencies. Given Feyenord's inability to produce a valid driver's license, his nervous behavior, and these unsettling inconsistencies, Pinkes could reasonably have concluded, based on "specific and articulable facts and the specific reasonable inferences which follow from such facts," that Feyenord and Cox were engaged in criminal activity beyond Feyenord's nonpossession of a license and the vehicle's malfunctioning headlight. *Commonwealth* v. *King, supra* at 243. Pinkes was thus justified in further detaining Feyenord and Cox and expanding the scope of his investigation beyond mere motor vehicle violations. See *Commonwealth* v. *Wilson,* 360 Mass. 557, 559-560 (1971) (defendant's incredible claim of ignorance about provenance of water pistol in vehicle justified further inquiry); *Commonwealth* v. *Lantigua,* 38 Mass. App. Ct. 526, 528 (1995)

---

[5]It is important to distinguish this case from cases in which the driver of a vehicle stopped for a traffic violation produces a valid driver's license and registration. See, e.g., *Commonwealth* v. *Loughlin,* 385 Mass. 60, 61-62 (1982); *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 (1978). Where an officer conducts an uneventful threshold inquiry giving rise to no further suspicion of criminal activity, he may not prolong the detention or expand the inquiry. See *Commonwealth* v. *Torres,* 424 Mass. 153, 158-159 (1997); *Commonwealth* v. *King,* 389 Mass. 233, 243-244 (1983).

[6]The total investigative detention of Feyenord, from the time of the stop to the sniff by the dog was between twenty-five and thirty minutes.

("Inability to produce a license or a registration reasonably gives rise to a suspicion of other offenses, such as automobile theft . . ."). See also 4 W. R. LaFave, Search and Seizure § 9.2(f), at 334-335 (4th ed. 2004), and cases cited ("if the suspect's explanation needs to be checked out, and in particular if his explanation is known to be false in some respects, there is reason to continue the detention somewhat longer while the investigation continues").

Having concluded that Pinkes was entitled to extend Feyenord's detention and expand the scope of his investigation, we must consider whether his decision to summon and employ a drug-sniffing dog required additional facts that specifically pointed to Feyenord's involvement in drug-related activity.[7] See, e.g., *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 213 (2004) (Greenberg, J., dissenting) (facts must specifically arouse suspicion of narcotics trafficking in order to justify detaining the driver for the purpose of calling canine unit to conduct drug sniff), citing *United States* v. *Perkins*, 348 F.3d 965, 970-971 (11th Cir. 2003)[8] and *People* v. *Caballes*, 207 Ill. 2d 504, 509-510 (2003), vacated, 543 U.S. 405 (2005). See also *State* v. *Wiegand*, 645 N.W.2d 125, 137 (Minn. 2002)

---

[7] We do not decide, as the Supreme Court did in *Illinois* v. *Caballes*, 543 U.S. 405 (2005), whether the police may initiate a canine sniff of a vehicle stopped for a traffic violation, in the absence of any suspicion of criminal activity beyond the violation. In that case, the Court "proceed[ed] on the assumption that the officer conducting the dog sniff had no information about respondent except that he had been stopped for speeding." *Id.* at 407. To the extent such a tactic raises art. 14 concerns, we need not consider them here, as Pinkes's conduct *was* based on a reasonable suspicion of additional criminal activity.

[8] In *United States* v. *Perkins*, 348 F.3d 965, 967-968 (11th Cir. 2003), a police officer stopped a motorist for a marked lanes violation, and the driver produced a valid out-of-State driver's license and insurance information, which revealed nothing remarkable during a routine driver's license and warrant check. After giving the driver a warning for the traffic violation, the officer continued to detain the driver to await the arrival of a drug-sniffing dog, which subsequently discovered narcotics in the vehicle. *Id.* at 968. The case squarely falls within the category of cases discussed in note 5, *supra*, involving an improper detention and expanded investigation after an uneventful threshold inquiry, and its reasoning is therefore inapplicable to this case, where the officer's initial inquiry raised reasonable suspicions of "other illegal activity beyond the traffic offense." *United States* v. *Perkins, supra* at 970.

("reasonable, articulable suspicion of drug-related criminal activity" necessary to conduct dog sniff after vehicle stopped for routine equipment violation). Because we conclude that Pinkes's course of action was reasonable, it did not impermissibly expand the scope of his investigation.

Although the facts supported the trooper's suspicion that criminal activity was "afoot," *Terry* v. *Ohio*, 392 U.S. 1, 30 (1968), the specific type of criminal activity that might be "afoot" was decidedly uncertain. The facts were consistent with a number of possibilities, including automobile theft, fugitive flight, and the transportation of contraband, to list just a few. "An expeditious collateral inquiry which might result in the suspect['s] arrest or prompt release is not unreasonable when done to meet 'the practical demands of effective criminal investigation and law enforcement.' " *Commonwealth* v. *Barros*, 425 Mass. 572, 585 (1997), quoting *Commonwealth* v. *Salerno*, 356 Mass. 642, 646-647 (1970). Faced with facts such as those presented here, an officer must make judgments about what resources are readily available to him that might quickly dispel or confirm his suspicion that the driver is involved in some form of criminal activity.[9] Such judgments should not be second guessed by courts, particularly where "the police are acting in a swiftly developing situation." *Commonwealth* v. *Sinforoso, supra* at 325, quoting *United States* v. *Sharpe*, 470 U.S. 675, 686 (1985). We are disinclined to promulgate a rule artificially prioritizing or limiting the investigative methods that an officer may utilize in these circumstances. The test is one of reasonableness, and the decision to call a canine officer and drug-sniffing dog stationed nearby to confirm or dispel the possibility of drug transportation was far from unreasonable in this case.[10]

Equally important, the detention of Feyenord (while poten-

---

[9]It goes without saying that the driver cannot be held indefinitely until all avenues of possible inquiry have been tried and exhausted. See *United States* v. *Sharpe*, 470 U.S. 675, 685 (1985) ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop"); 4 W.R. LaFave, Search and Seizure § 9.2(f), at 337 (4th ed. 2004), and cases cited ("There is no general rule that the detention may continue so long as the reasonable suspicion giving rise to the stop remains, for if this were the rule some stops could be continued indefinitely").

[10]Given Feyenord's lack of identification and Cox's identification as a foreign national, Pinkes may have had few other investigative avenues to ad-

tially embarassing) was not overly prolonged or onerous in duration. As with all investigative stops of this nature, the police had a responsibility to proceed expeditiously with their investigation. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States* v. *Sharpe, supra.* In this case, Pinkes followed his inquiry of the occupants of the vehicle by promptly summoning the canine unit, and the total detention lasted no longer than thirty minutes.[11] See *Commonwealth* v. *Sinforoso, supra* at 325-326.

In sum, we conclude that "the conduct of the officer[] was proportional to the escalating suspicion that emerged over the course of the stop." *Commonwealth* v. *Sinforoso, supra* at 323. Consequently, Feyenord's detention for the purpose of summon-

---

dress his escalating suspicions, aside from arresting Feyenord and impounding the vehicle. Pinkes did question Feyenord about the ownership of the vehicle at some point during the stop, although it does not appear from the record that Pinkes conducted any records check with respect to Feyenord's false name (which Pinkes likely suspected was false given his questioning of Cox) or the vehicle's registration plate number. The use of such investigative methods is uniformly approved by State and Federal courts but, ironically, may have the effect of expanding the scope and the duration of an investigation incident to a traffic stop far more than a canine sniff. 4 W. R. LaFave, Search and Seizure, *supra* at § 9.3(c), at 378, and cases cited.

[11]Few jurisdictions have found detentions of thirty minutes or less unreasonable. See, e.g., *United States* v. *Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (fifty-minute detention, thirty-five minutes of which spent awaiting drug dog, reasonable); *United States* v. *Shareef*, 100 F.3d 1491, 1501-1502 (10th Cir. 1996) (thirty-minute wait for computer check during traffic stop reasonable); *United States* v. *McCarthy*, 77 F.3d 522, 532 (1st Cir.), cert. denied, 519 U.S. 991 (1996), and cert. denied sub nom. *Hunter* v. *United States*, 519 U.S. 1093 (1997) (seventy-five minutes reasonable where defendant gave evasive responses to official inquiries); *State* v. *Moffatt*, 450 N.W.2d 116, 118-119 (Minn. 1990) (sixty-one minute stop permissible). Cf. *United States* v. *Sharpe*, 470 U.S. 675, 686 (1985) (declining to deem unreasonable, as matter of law, all *Terry* stops exceeding twenty minutes); *United States* v. *Place*, 462 U.S. 696, 699, 709 (1983) (ninety-minute stop unreasonable); *People* v. *Cox*, 202 Ill. 2d 462, 469-470 (2002), cert. denied, 539 U.S. 937 (2003) (fifteen-minute detention pending arrival of drug dog unreasonable where police stopped vehicle for rear registration plate light malfunction and summoned canine unit before speaking with driver).

ing a canine unit with a drug-sniffing dog was not contrary to either the Fourth Amendment or art. 14.

d. *The dog sniff of the vehicle.* Finally, Feyenord argues that the motion to suppress was improperly denied because the use of the dog to ascertain the presence of drugs in the vehicle was an unreasonable "search" contrary to the Fourth Amendment and art. 14. Feyenord's Fourth Amendment argument is foreclosed by decisions of the Supreme Court, including *Illinois* v. *Caballes*, 543 U.S. 405, 410 (2005) ("dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has a right to possess does not violate the Fourth Amendment"), and *Indianapolis* v. *Edmond*, 531 U.S. 32, 40 (2000) (while vehicle stop effectuates Fourth Amendment seizure, use of narcotics-detection dog around vehicle's exterior does not transform seizure into search). It remains for us to consider whether such a canine sniff is a search under art. 14. See, e.g., *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 662 (1999), and cases cited ("[w]e have expressly granted . . . protections to drivers and occupants of motor vehicles under art. 14 in a variety of areas, and we have done so to guarantee protections that, in some cases, may not be recognized under the Fourth Amendment").

"When we confront the question whether police activities amount to a search or seizure within the meaning of art. 14, we ask 'whether the defendants' expectation of privacy [in the circumstances] is one which society could recognize as reasonable.' " *Commonwealth* v. *Blood*, 400 Mass. 61, 68 (1987), quoting *Commonwealth* v. *Podgurski*, 386 Mass. 385, 388 (1982). See *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991). We agree with the Appeals Court that "the dog's sniff and resulting 'alert' would constitute a search only if society were prepared to say that the defendant was reasonable in his subjective expectation of privacy in the odor of cocaine emanating from his car. We think that society is wholly unprepared and unwilling to take that step." *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 207-208 (2004). Accordingly, we conclude that a dog sniff of a properly stopped vehicle is not a search

under art. 14.[12] See *Illinois* v. *Caballes, supra* at 409; *Indianapolis* v. *Edmond, supra* at 40; *Commonwealth* v. *Sinforoso, supra* at 324, citing *United States* v. *Place, supra* at 707. See also *State* v. *Wiegand,* 645 N.W.2d 125, 132-133 (Minn. 2002) (canine sniff of automobile not "search" under Minnesota Constitution; "we perceive no sound basis on which to reject the U.S. Supreme Court's approach to the Fourth Amendment issue presented in this case").[13]

After "the dog indicated the presence of narcotics in the rear of the car, the police had probable cause to search the car." *Commonwealth* v. *Sinforoso, supra* at 324, citing *Commonwealth* v. *Pinto,* 45 Mass. App. Ct. 790, 793 (1998). Consequently, the discovery and seizure of the contraband was proper and Feyenord's motion to suppress was correctly denied.

2. *Sufficiency of the evidence.* Feyenord argues that the judge erred in denying his motion for a required finding of not guilty, which he made at the close of the Commonwealth's case and at the close of all the evidence, because the evidence did not demonstrate his participation in a joint venture to traffic in

[12]The use of dogs in other settings (e.g., to sniff the body of a person or the odors emanating from private homes) is not at issue in this case, and would have to be evaluated based on whether the privacy expectation in each of those settings is one society is willing to deem reasonable. *Commonwealth* v. *Feyenord,* 62 Mass. App. Ct. 200, 208 (2004). See *State* v. *Wiegand,* 645 N.W.2d 125, 130-131 n.5 (Minn. 2002). For example, we note the heightened protection afforded homes in our search and seizure jurisprudence. *Commonwealth* v. *Balicki,* 436 Mass. 1, 12 n.14 (2002) ("Nowhere are expectations of privacy greater than in the home . . ."). *Commonwealth* v. *Blood,* 400 Mass. 61, 68-70 & n.9 (1987) (expectation that conversational exchange in private home will not be invaded surreptitiously is reasonable).

[13]Interpreting their State Constitutions, several State courts have held that the use of a drug dog to sniff the exterior of a vehicle constitutes a "search." See, e.g., *People* v. *Haley,* 41 P.3d 666, 672 (Colo. 2001); *State* v. *Tackitt,* 315 Mont. 59, 66 (2003); *State* v. *Pellicci,* 133 N.H. 523, 533 (1990); *Commonwealth* v. *Rogers,* 578 Pa. 127, 135 (2004). Other State courts have concluded that such canine sniffs are not "searches" under their respective State Constitutions. See, e.g., *O'Keefe* v. *State,* 189 Ga. App. 519, 526 (1988); *State* v. *Wiegand, supra* at 133; *State* v. *Waldroup,* 100 Ohio App. 3d 508, 514 (1995). Regardless of the State constitutional status of canine sniffs, many State courts require an officer to have some form of reasonable suspicion before using a drug dog to sniff the exterior of a vehicle, but none requires that an officer obtain a warrant or have probable cause to believe that there is contraband in the vehicle. See *Fitzgerald* v. *State,* 384 Md. 484, 511-512 n.14 (Ct. App. 2004), and cases cited.

cocaine. "The essential question in evaluating the denial of a mo-
tion for a required finding of not guilty is whether the evidence
received, viewed in a light most favorable to the Commonwealth,
is sufficient so that the jury 'might properly draw inferences, not
too remote in the ordinary course of events, or forbidden by any
rule of law, and conclude upon all the established circumstances
and warranted inferences that the guilt of the defendant was
proved beyond a reasonable doubt.' " *Commonwealth* v. *Pope*,
406 Mass. 581, 584 (1990), quoting *Commonwealth* v. *Clary*,
388 Mass. 583, 588 (1983). "It is not essential that the inferences
drawn from facts or circumstances be necessary inferences. . . .
It is enough if the inferences drawn from the circumstances be
reasonable and possible. . . . The weight of the evidence is for
the jury." (Citations omitted.) *Commonwealth* v. *Medeiros*, 354
Mass. 193, 197 (1968), cert. denied sub nom. *Bernier* v. *Mas-
sachusetts*, 393 U.S. 1058 (1969).

State Troopers Pinkes and Devlin testified at trial, providing
much the same account as offered at the hearing on Feyenord's
motion to suppress and credited by the judge in his findings on
the motion.[14] After the troopers arrested Feyenord, they
discovered $510 on his person, including twenty-five twenty
dollar bills and one ten dollar bill. A State trooper specializing
in narcotics investigations testified that later testing of the
substance discovered in the vehicle revealed that the bags
contained 163 grams of sixty-one per cent concentration crack
cocaine, the street value of which was more than $16,000. The
State trooper testified that the purity and packaging of the
cocaine and the discovery of a scale with the drugs were
consistent with drug dealing.

In Feyenord's defense, a former girl friend of Feyenord's
uncle testified that Feyenord had stayed in her Worcester home
the night before his arrest, after he arrived on a bus from New
York City. She also testified that she gave Feyenord permission
to drive her vehicle back to New York so long as he returned it
the same day, but indicated that there were no drugs in the

---

[14]The jury did not learn of Cox's responses to Pinkes's questions, as those
responses were excluded as hearsay prior to trial. Cox apparently posted bail
after his arrest, and his whereabouts were unknown at the time of trial.

vehicle when she lent it to him. Feyenord testified in his own defense and denied that he had any knowledge of the cocaine found in the vehicle. He claimed that he was in Massachusetts investigating the possibility of moving here from New York.[15] On the day of his arrest, he borrowed the vehicle to help his friend Junior Cox, with whom he had traveled from New York City, transport numerous shopping bags back home. Feyenord asserted that, while Cox had placed his parcels in the trunk, he had not looked in the trunk himself. He explained that he gave a false name, the name of a cousin, to Pinkes at the traffic stop because he was wanted on an outstanding default arrest warrant from 1995, which he did not want discovered. Feyenord also testified that the large sum of cash on his person had been wired to him for work he performed as an auto detailer while in New York City, although the defense did not further substantiate the claim.

At trial, the Commonwealth argued alternatively that Feyenord was guilty of cocaine trafficking as a principal or as a participant in a joint venture. The jury found Feyenord guilty solely as a joint venturer.[16] In order to succeed on a theory of joint venture, the Commonwealth must prove that the defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Charros*, 443 Mass. 752, 758-759 (2005), quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). We conclude that the evidence was sufficient to support the jury's verdict. See *Commonwealth* v. *Charros*, *supra* at 759; *Commonwealth* v. *Sabetti*, 411 Mass. 770, 780 (1992).

The jury could have reasonably concluded that Feyenord knew of the large quantity of drugs stored in the vehicle he was driving because Feyenord appeared nervous when approached by Pinkes and provided false, evasive, and implausible answers

---

[15]Feyenord also testified that he had been in Worcester the previous week and had driven the motor vehicle during that visit as well. The former girl friend of Feyenord's uncle did not corroborate this detail.

[16]Given this result, we need not reach Feyenord's argument that the judge erred in denying his motions for a required finding of not guilty on the theory of principal liability.

to police questions. See *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 328-329 (2001) (nervousness and responses to police questions that are inconsistent and implausible suggest defendant's connection to drugs); *Alicea* v. *Commonwealth*, 410 Mass. 384, 387-388 (1991) (defendant's agitation may support inference that he knew drugs were present). In addition, Feyenord possessed a large sum of cash when arrested, in denominations consistent with his involvement with drug dealing. See, e.g., *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 410 (1989). From this evidence, the jury could have inferred that Feyenord was at least assisting Cox with the enterprise of trafficking cocaine.

As Feyenord was driving a vehicle containing a large quantity of cocaine and the Commonwealth's case permitted a reasonable inference that Feyenord knew of the cocaine and intended to assist Cox with trafficking it, the evidence supports the jury's verdict of Feyenord's guilt as a joint venturer. We see no error in the denial of Feyenord's motions for a required finding of not guilty.

*Judgment affirmed.*

GREANEY, J. (concurring). I agree with the court that the defendant's motion to suppress was properly denied because the police acted lawfully. In the circumstances that occurred, when a police officer harbors a reasonable suspicion that a crime has been committed, and that suspicion escalates, based on multiple false and evasive responses, and then reasonably focuses on the possibility of drug-related criminal activity,[1] a dog sniff around the exterior of an otherwise lawfully stopped vehicle is a permissible investigative technique. I write separately, however, to

---

[1]The situation presented to the State trooper was fused with tension and not simply one in which the defendant had difficulty in producing proper documentation. In my view, the contradictory statements given by the two men with respect to their relationship and travel destination (the defendant identified his passenger as his brother-in-law and stated that they were traveling to see a "friend" in Putnam, Connecticut, while his passenger declared that he knew the defendant only as "Pat" and asserted that their intended destination was Brooklyn, New York) raised grave concerns that virtually compelled Trooper Pinkes, who was trained and experienced in narcotics investigations, to pursue further the possibility of illegal drug activity.

voice my concern that it not become a routine occurrence to summon a drug sniffing dog to the scene whenever the operator, or passengers, of a vehicle that has been stopped for a minor traffic violation, appear nervous or answer an officer's questions inconsistently.

In our democratic society, special concern must be vigilantly exercised by the courts to balance the rights of the police under the principles of *Terry* v. *Ohio*, 392 U.S. 1 (1968) (which have expanded considerably over the years since *Terry* was decided), with the protections afforded less powerful citizens who often feel the brunt of *Terry*-type stops. Many of these citizens (some even noncitizens), because of their economic standing, will be driving vehicles with defective equipment or driving them without proper licenses or registrations. Moreover, these vehicles will frequently be operated in areas of cities that have known drug zones (Lowell, Holyoke, Springfield, parts of Boston, to mention a few). The police, endeavoring to stamp out drug commerce and use, will invariably be making traffic stops in these zones. The lack of a license or proper registration or the commission of a routine traffic violation, coupled with nervousness, or even some evasion on the part of the operator or others in the vehicle, may provide a basis to continue detention under *Terry* principles, but should not, by themselves, provide a basis to bring in a drug-sniffing dog. As cogently noted by Professor LaFave:

> "Allowing . . . dogs to be used serves only as a positive encouragement for police to engage in pretext and subterfuge, hardly a defensible move given the common knowledge that traffic-law enforcement has been diverted from its justified objectives to serve as a means for seeking out drugs. Allowing use of the drug dogs at all in conjunction with traffic stops can only encourage the making of stops for insignificant and technical violations on the basis of unarticulated suspicions and mere hunches or, at worst, on totally arbitrary and discriminatory bases. Moreover, allowing use of the dogs at all adds to the process another decision, whether to summon a drug dog, that the cases indicate requires no reasonable suspicion nor, for that matter, any justification whatsoever, but that

the practice indicates is also likely to be made on an arbitrary basis." (Footnotes omitted.)

LaFave, The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment, 102 Mich. L. Rev. 1843, 1896 (2004). See 4 W.R. LaFave, Search and Seizure § 9.3(f), at 400 (4th ed. 2004).

This case also provides an opportunity to speak directly to the subject of racial or ethnic profiling in the context of the use of drug sniffing dogs during traffic stops. The majority of police officers proceed in good faith when making traffic stops. Some officers, however, do not and proceed more on stereotypical thinking and hunches, using dubious investigative techniques that result in the harassment of racial and ethnic minorities. In his concurring opinion in *Commonwealth* v. *Gonsalves*, 429 Mass. 658 (1999), Justice Ireland wrote of "the dangers posed by unfettered police power to order individuals out of automobiles without any justification" and of documented "widespread public concerns about police profiling, commonly referred to as 'DWB — driving while black.' " *Id.* at 669, 670 (Ireland, J., concurring). The same kind of discriminatory conduct is also directed at other ethnic groups, especially Hispanics. A motorist must *never* be stopped based on his or her race or ethnicity without legally sufficient cause. Getting a traffic ticket is never a happy experience. Getting a traffic ticket if you are a black or Hispanic person who has committed a minor traffic violation and then been questioned in public view by an armed police officer determined to find a basis, or extract consent, to bring in a police dog, is humiliating, painful, and unlawful. See generally S.R. Gross, Road Work: Racial Profiling and Drug Interdiction on the Highway, 101 Mich. L. Rev. 651 (2002).

A dog sniff is not a search under the Fourth Amendment to the United States Constitution, see *Illinois* v. *Caballes*, 543 U.S. 405, 407-410 (2005); *United States* v. *Place*, 462 U.S. 696, 707 (1983), and the court correctly concludes that a dog sniff of the exterior of an automobile is likewise not a search within the meaning of art. 14 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *One 1985 Ford Thunderbird Auto.*, 416 Mass. 603, 607-609 (1993) (helicopter surveillance of backyard

of private home not a search); *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991) (measure of expectation of privacy under art. 14 is "(1) whether the defendant has manifested a subjective expectation of privacy in the object of the search, and (2) whether society is willing to recognize that expectation as reasonable"). I would pursue the art. 14 analysis a step further, however, and candidly acknowledge that the use of a dog during a traffic stop, while not a full search in the constitutional sense, is more than a de minimis intrusion into the detained individual's privacy interests. See *Commonwealth* v. *Gonsalves*, *supra* at 662-663 (art. 14 extends protections to drivers and occupants of motor vehicles beyond those granted by Fourth Amendment and protects Massachusetts citizens from being subjected to unjustified exit orders during routine traffic stops). I would recognize that the act of summoning a dog heightens the tension inherent in any traffic stop to a measurable degree, and that the use of a drug-sniffing dog, even around the exterior of a vehicle, sends a clear public signal, not only to the detained motorist, but to all others passing by, that a drug investigation is in progress. See 4 W.R. LaFave, Search and Seizure, *supra* at § 9.3(f), at 401. In sum, "[i]njecting [a dog] into a routine traffic stop changes the character of the encounter between the police and the motorist. The stop becomes broader, more adversarial, and (in at least some cases) longer." *Illinois* v. *Caballes*, *supra* at 421 (Ginsburg, J., dissenting). Taking a broader perspective, there is something viscerally disturbing about the use of police dogs in traffic stops — something that hints at the oppressive measures used by police in societies where respect for personal freedom and privacy are devalued or nonexistent.

In my view, we should clearly delineate the permissible bounds of a routine traffic stop, beyond which police officers may not go, in order fully to protect the art. 14 rights of all our citizens and to avoid even the appearance of having countenanced official discrimination and harassment. A police officer conducting a traffic stop may not summon a canine officer and dog on a mere hunch or unarticulated suspicion that drugs might be discovered in the stopped vehicle. See *State* v. *Wiegand*, 645 N.W.2d 125, 136-137 (Minn. 2002). Nor may the officer continue to engage the vehicle's occupants in arbitrary or dila-

tory questioning, thus surreptitiously enlarging the duration and
scope of the stop, in the expectation that circumstances may
turn up justification, or consent obtained, to initiate a dog sniff
of the vehicle. See *People* v. *Cox*, 202 Ill. 2d 462, 470-471
(2002), cert. denied, 539 U.S. 937 (2003); *State* v. *Mitchell*, 265
Kan. 238, 244-245 (1998). Even when an officer's decision to
summon a dog is based on a justifiable suspicion of drug-related
activity that arose during the course of the stop, the dog sniff
and its fruits should be suppressed if tainted by the officer's
protracted detention of the vehicle's occupants and failure
promptly to terminate the stop when its original lawful objec-
tives are accomplished. See *Commonwealth* v. *McCleery*, 345
Mass. 151, 153-154 (1962). The court recognizes this to be
true, *ante* at 78 n.5, but, nonetheless, considers it significant
that the defendant's detention "was not overly prolonged or
onerous in duration" and "lasted no longer than thirty minutes."
*Ante* at 81. In the usual case, thirty minutes is too long to detain
a motorist, in order to effectuate a dog sniff of the vehicle, in
the absence of a reasonable articulable suspicion of drug-related
activity. An officer's conduct during a *Terry*-type stop of a mo-
tor vehicle must be *at all times* lawfully related in scope to the
circumstances that justified the stop in the first place, or to
unfolding circumstances as they develop. See *Terry* v. *Ohio*,
*supra* at 19-20. We must ensure that, under art. 14, the use of a
drug-sniffing dog in connection with a routine traffic stop
remains the exception and does not become the rule.

MARSHALL, C.J. (dissenting, with whom Ireland, J., joins).
Today the court holds that the police may use a drug-sniffing
dog to make a public and targeted investigation of an automobile
driver pulled over for a routine traffic violation (driving during
the day time with only one working headlight), even though the
police have no reason to suspect that he is involved in any il-
licit drug activity. Because the scope of the canine detection in
this case was neither reasonable in the circumstances nor
proportional to the investigating officer's actual suspicions, as is
required by our settled jurisprudence, I respectfully dissent.

It is black letter law that, to withstand a challenge to evidence

seized during an investigatory stop, the Commonwealth must show that "it was permissible to initiate" the stop and that "the scope of the seizure was justified by the situation." *Commonwealth* v. *Williams*, 422 Mass. 111, 116, 118 (1996), citing *Terry* v. *Ohio*, 392 U.S. 1, 19-20 (1968). I agree with the court that, in this case, the stop was legal. *Ante* at 75.

Our interpretation under art. 14 of the Massachusetts Declaration of Rights of the permissible "scope" of any ensuing investigation is equally settled. Any broadening in the scope of the investigatory stop must be "reasonable" and "proportional" in light of the "degree of suspicion the police reasonably harbor." *Commonwealth* v. *Williams*, *supra* at 116, 117. See *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 323 (2001) ("In evaluating whether the police exceeded the permissible scope of a stop, the issue is one of proportion"); *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 662-663, 665 (1999) (reasonableness requirement in escalation of scope of traffic stops helps prevent arbitrary or harassing police conduct). I cannot agree with the court's conclusion that the decision by the state trooper to summons a narcotics sniffing dog was "reasonable." *Ante* at 80.

It is uncontested in this case that the investigating state trooper had no reason to suspect that the defendant was involved in any drug activity when he ordered the canine search. Rather, as the court candidly recognizes, the trooper had only a generalized suspicion that something might be afoot. What that something was, was "decidedly uncertain," and "consistent with a number of possibilities." *Ante* at 80. There is nothing in the record to indicate that the police "reasonably focuse[d] on the possibility of drug-related criminal activity." *Ante* at 86. A motorist's nervousness and false responses to police questions, without more, does not permit the police to conclude that illegal narcotics activity is afoot.[1] In this case, as the Appeals Court

---

[1]Significantly, the judge did not find that the State trooper had reason to suspect the defendants of illicit narcotics activity, and the Commonwealth has never made such a claim. The record confirms that there was nothing about the actions or responses of the defendant that suggested illegal narcotics activity. The trooper did not testify to an odor of drugs, that the defendant was weaving while driving, that his eyes were glassy, or that his speech was abnormal. The trooper who pulled the defendant's automobile over was in fact

noted, at the point he decided to summon a police dog trained "to detect marijuana, cocaine, hashish, and heroin," the trooper had determined only that "*something* meriting further investigation was afoot" (emphasis added). *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 203 (2004).

I conclude that the use of a drug-detection dog is not "proportional" or "justified" during a routine traffic stop unless the police have a reasonable suspicion that the detained individual is engaged in unlawful drug-related activities. See *Illinois* v. *Caballes*, 543 U.S. 405, 418-422 (2005) (Ginsburg, J., dissenting) (use of drug-sniffing dog during traffic stop "broaden[s] the scope of the traffic-violation-related seizure" and therefore ought to require reasonable suspicion). This is not only required, as I shall explain, by our art. 14 jurisprudence, but also is consistent with the conclusions of numerous other State courts of last resort, examining the limits imposed by their respective State Constitutions on targeted canine drug sniffing. See, e.g., *State* v. *Wiegand*, 645 N.W.2d 125, 137 (Minn. 2002) (reasonable suspicion of drug activity required before initiation of canine sniff); *State* v. *Pellicci*, 133 N.H. 523, 534 (1990) (same); *People* v. *Dunn*, 77 N.Y.2d 19, 26 (1990), cert. denied, 501 U.S. 1219 (1991) (same); *Commonwealth* v. *Johnston*, 515 Pa. 454, 465-467 (1987) (same). See also *State* v. *Tackitt*, 315 Mont. 59, 69-70 (2003) ("particularized suspicion" of narcotics required to initiate sniff).

A canine drug sniff conducted during the course of a traffic

trained in narcotics interdiction. He did not testify that he suspected that the defendant was engaged in any illicit drug activity when he decided to summons the narcotics-detection dog. He testified only that, at the time he summoned the dog, he had ascertained that the defendant may have been driving without a license, that he had given a false name and appeared nervous, and that there were inconsistencies between the defendant's responses to routine questions and the statements of the passenger in the automobile. See *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 211 (2004) (Greenberg, J., dissenting). The officer testified that he was "suspicious" of the defendant and the passenger, but not that he had a particularized suspicion that either of the two men possessed drugs. See *State* v. *Wiegand*, 645 N.W.2d 125, 128-129, 137 (Minn. 2002) (no reasonable suspicion sufficient to conduct canine drug sniff where individual stopped for inoperable headlight appeared nervous, had glossy eyes, and denied consent to search car, and officer was suspicious but did not suspect that individual was under influence of drugs).

stop is intrusive, embarrassing, and anxiety inducing.[2] That
" 'drug dogs are not lap dogs' . . . changes the character" of
an interaction between a police officer and a private citizen,
which "becomes broader, more adversarial, and (in at least
some cases) longer" when the police officer insists on probing
the citizen with a drug sniffing dog. *Illinois* v. *Caballes, supra*
at 421 (Ginsburg, J., dissenting), quoting *United States* v.
*Williams*, 356 F.3d 1268, 1276 (10th Cir.) (McKay, J., dissent-
ing), cert. denied, 543 U.S. 852 (2004). See 1 W.R. LaFave,
Search and Seizure § 2.2(g), at 537 (4th ed. 2004) (canine
search of persons "is embarrassing, overbearing and harassing,
and thus should be subject to Fourth Amendment restraints").
Traffic stops occur in public places, and the motorist involved
may often be known to others passing by. As Justice Greaney
notes, a canine search "sends a clear public signal, not only to
the detained motorist, but to all others passing by, that a drug
investigation is in progress." *Ante* at 89. See 4 W.R. LaFave,
Search and Seizure § 9.3(f), at 401 (4th ed. 2004). I cannot
agree with the court that detaining a motorist at the side of the
road while the police use a dog to sniff his vehicle is merely
"potentially embarrassing." *Ante* at 80-81. Rather, I share
Justice Greaney's concerns that the use of drug-sniffing dogs,
when used during a traffic stop, "is more than a de minimis
intrusion into the detained individual's privacy interests." *Ante*
at 89. For these reasons, the use of a narcotics detection dog is
"intimidating" and "upsetting to the innocent motorist." Y. Ka-
misar, W.R. LaFave, J.H. Israel, & N.J. King, Modern Criminal

---

[2]The court's opinion pays little, if any, attention to the issue whether
targeted canine narcotics detection itself broadens the scope of any investiga-
tory stop. Rather, the court focuses, unnecessarily in my view, on the length of
the defendant's detention at the side of the road. It is settled that, had they
completed their legitimate investigation, the police could not (without reason-
able suspicion) have detained the defendant further to await the dog's arrival.
*Illinois* v. *Caballes*, 543 U.S. 405, 408 (2005), citing *People* v. *Cox*, 202 Ill.
2d 462 (2002), cert. denied, 539 U.S. 937 (2003). Today's holding creates
troublesome incentives because "the stopping officer is tempted to engage in
stalling regarding his proper function during the stop . . . in order to give the
appearance that the time for the stop has not expired in the interim." Y. Ka-
misar, W.R. LaFave, J.H. Israel, & N.J. King, Modern Criminal Procedure
430-431 n. (11th ed. 2005), quoting 4 W.R. LaFave, Search and Seizure
LaFave § 9.3(f) (4th ed. 2004).

Procedure 430-431 n. (11th ed. 2005), quoting 4 W.R. LaFave, *supra* at § 9.3(f). No individual should be individually probed in this manner unless the police have reasonable suspicion that drug activity is afoot.[3]

In my judgment, that conclusion is compelled by our art. 14 jurisprudence. In *Commonwealth* v. *Gonsalves, supra* at 663, we held that a police officer must have "a reasonable belief that the officer's safety, or the safety of others, is in danger before ordering a [person] out of a motor vehicle." In other words, even if a police officer has a legitimate basis for extending a traffic stop (in *Commonwealth* v. *Gonsalves, supra* at 660, the police suspected some illegal activity because the defendant passenger was "extremely nervous" and "appeared to be breathing heavily"), the officer cannot order a person out of a vehicle unless the officer has a reasonable belief that removal from the vehicle is required for reasons of safety. We explained in that case that our "rule" is rooted in art. 14's requirement that the police respect the privacy of motorists, avoid unnecessary delay and inconvenience in making traffic stops, *id.* at 663-664, and act at all times "in a reasoned way." *Id.* at 665.[4] If our Constitution requires a "reasonable" fear for safety to justify ordering a motorist out of an automobile during a traffic stop, surely it requires no less before a canine drug sniff can be initiated against an individual stopped for a routine traffic violation:

[3]Well-trained dogs often "alert" to innocent people. *Illinois* v. *Caballes,* 543 U.S. 405, 411-412 (2005) (Souter, J., dissenting). In one case, school officials initiated a canine sniff of their teenage students. The dogs "alerted" to fifty students, thirty-three of whom later were revealed to have been innocent. A dog alerted to one junior high school girl. She was asked to empty her pockets, which contained no drugs. She was then strip searched, but, again, no drugs were found. Later, it was revealed that the girl had been playing that morning with her own dog, who was in heat. *Doe* v. *Renfrow,* 475 F. Supp. 1012 (N.D. Ind. 1979), aff'd in part, 631 F.2d 91 (7th Cir. 1980), cert. denied, 451 U.S. 1022 (1981). See 1 W.R. LaFave, Search and Seizure § 2.2(g), at 532-534 (4th ed. 2004). Rare as such occurrences may be, they evidence the potential of canine narcotics detection to create a serious and unwarranted intrusion into a person's life.

[4]We reached our conclusion despite decisions of the United States Supreme Court to the contrary. See, e.g., *Pennsylvania* v. *Mimms,* 434 U.S. 106, 111 (1977) (on routine traffic stop police officer may, without additional basis, order driver from vehicle); *Maryland* v. *Wilson,* 519 U.S. 408, 415 (1997) (same, regarding passenger).

ordering a person from an automobile typically is less intrusive than conducting a canine narcotics sniff. A particularized "reasonable suspicion" requirement for canine drug detection during traffic stops prevents baseless harassment of citizens, without erecting any barrier to legitimate law enforcement activities. See *Commonwealth* v. *Gonsalves, supra* at 662-664.

The targeted use of a narcotics detection dog against a particular individual stopped for a routine traffic stop is entirely distinguishable from properly conducted police efforts to ensure public safety. The use of specially trained dogs in airports, schools, subway stations, or other such public arenas gives rise to issues not present in this case. See, e.g., *Illinois* v. *Caballes, supra* at 424-425 (Ginsburg, J., dissenting) (distinguishing search and seizure standards involving "general interest in crime control" from those involving "more immediate threats to public safety"), and cases cited. Reasonable canine detection can be utilized for public safety purposes without violating our carefully developed art. 14 jurisprudence.

The court's conclusion that canine narcotics detection is permissible in this case means necessarily that drug-sniffing dogs may be called in any time the police sense that the subject of a routine traffic stop is engaged in "some" unspecified wrongdoing. In so holding, the court departs (without reason or explanation) from our settled jurisprudence and deprives our citizens of meaningful protection from an investigatory tactic widely recognized as intrusive and "viscerally disturbing." *Ante* at 89. I respectfully dissent.