Macdonald, D. Lloyd, J.
The motion is ALLOWED.
Facts
While on regular patrol on September 23, 2010 at approximately 8:55 p.m., Officer Kevin McKeon (“Mc-Keon”) of the North Attleboro Police Department made a routine computer inquiry into the registration status of a Nissan Altima vehicle (the “Nissan”) that was traveling several car lengths in front of him north on Route 1 in North Attleboro. The defendant was in the front passenger seat; the driver was Xiomarra Berrios (“Berrios”).
McKeon made 100-200 such inquiries during a typical patrol shift. At the time he entered the inquiry, McKeon did not know the sex, race or national origin of either the driver or the passenger.[1]
The response to the inquiry came back that the Nissan’s inspection sticker had expired. McKeon activated his blue lights. Almost immediately, McKeon saw the defendant twist around in his seat and with his right hand apparently place something behind the driver’s seat. McKeon suspected that the defendant had secreted a weapon.
Rather than immediately to pull over to the side of the busy roadway (at that juncture the Nissan was traveling on Route 1A — see Exhibits 1 and 2), Berrios turned into an adjacent CVS Pharmacy parking lot and stopped on a down slope just inside the entrance.
McKeon exited his cruiser and immediately saw that the defendant had gotten out of the Nissan. The defendant assumed an aggressive stance facing McK-eon, with his arms rigidly at his side and his fists clenched. McKeon demanded that the defendant show his hands. The defendant yelled something back at McKeon. Meanwhile a back-up officer arrived, who also loudly demanded that the defendant raise his hands. The defendant began to do so but then turned and ran away toward East Washington Street. See Exhibit 2. McKeon radioed for further assistance, and he and his back-up pursued the defendant. However, after McKeon followed the defendant across the parking lot and an adjacent street, he decided to return to the Nissan and to Berrios. The Nissan had not been moved.
When McKeon got back to the Nissan, he opened the rear door and checked under the driver’s seat because he suspected, as noted above, that the defendant had secreted a weapon there. McKeon found nothing.
McKeon asked Berrios why the defendant had run, and she stated that he owed money in connection with a Rhode Island court case. When asked for the defendant’s name, she falsely informed McKeon that his name was “Jose Fernandes.”
In the meantime, a child who had been in the backseat of the Nissan was ciying hysterically, and a crowd of people began to congregate around the scene. McKeon’s supervisor, Lt. Dawes, had arrived, and he ordered that Berrios follow McKeon’s cruiser to the North Attleboro police station (located approximately a half-mile away). Berrios complied. Lt. Dawes followed behind Berrios in his marked SUV.
While McKeon and Lt. Dawes were dealing with Berrios at the scene of the stop, the defendant was apprehended by other officers. His true identity was then determined. Inquiries into the criminal justice database disclosed that the defendant was the subject of a domestic restraining order sworn out by Berrios. When confronted with this information, Berrios falsely told McKeon that the respondent in the domestic case was the defendant’s father.[2] However, when they arrived at the station, the information on the domestic case had been updated, and the restraining order was found to have expired. Nevertheless, at the station McKeon received further information that the defendant had been previously charged with narcotics trafficking.
At that juncture, McKeon suspected that what the defendant had appeared to be secreting at the time the Nissan was initially stopped was narcotics, rather than a weapon (or in addition to a weapon). Furthermore, McKeon was not satisfied that his cursory examination of the area under the driver’s seat at the CVS scene was sufficient. His suspicions were not dispelled.[3]
Accordingly, McKeon decided to request the assistance of a drug-sniffing dog. Through a mutual aid request to the Attleboro Police Department, K-9 Mattie and Attleboro Officer Keith Bussiere (“Bussiere”) then responded to the North Attleboro station. (K-9 Mattie and Bussiere had been duly trained and certified. Exhibit 5.)[4] McKeon requested that Bussiere and K-9 Mattie “search” the Nissan. Bussiere understood that his task was to “search” the Nissan using K-9 Mattie.
Berrios and the child were instructed to wait in the lobby of the station while the search of the Nissan occurred.
In the implementation of his search of the Nissan, Bussiere initially had K-9 Mattie do an inspection of the Nissan’s exterior to see whether the dog would alert to evidence of narcotics. K-9 Mattie did not alert to any *484 part of the vehicle’s exterior. McKeon then asked that K-9 Mattie be directed to the interior rear area where McKeon suspected that the defendant had secreted narcotics and/or a weapon. Shortly after entering the rear seat, K-9 Mattie alerted to the presence of narcotics under the driver’s seat. McKeon then further searched the area and recovered a plastic bag containing a brick of cocaine. Exhibit 4.
Discussion
In the Court’s judgment, this is a close case. It involves excellent coordinated police work in response to a rapidly developing and potentially perilous situation arising out of a routine traffic stop.
McKeon’s initial entry into the Nissan at the CVS lot and quick inspection of the area under the driver’s seat was lawful. “It is settled in law that, in appropriate circumstances, a Terry type of search may extend into the interior of an automobile so long as it is limited in scope to aprotective end.” Commonwealth v. Silva, 366 Mass. 402, 408 (1974), as quoted in Commonwealth v. Santiago, 53 Mass.App.Ct. 567, 570 (2002). The defendant’s emphatically furtive movements when he became aware that the Nissan was being stopped and his threatening gestures to McKeon immediately after the stop and then his flight, all combined to give McKeon reasonable suspicion that there was a weapon under the front seat. “(T]hat it was reasonable for [McKeon] to take steps to ensure his safety is, given these conditions, obvious. Indeed, it would have been foolhardy not to have done so.” Id. at 571.
Furthermore, the temporary detention of the Nissan for purposes of its examination by a drug-sniffing dog was reasonable given the facts in hand. Commonwealth v. Feyenord, 445 Mass. 72, 77-78 (2005). And exposing the vehicle to the external inspection by K-9 Mattie impinged neither the defendant’s Fourth Amendment nor his Article 14 rights. Id. at 82-83.
However, with that examination resulting in no “alert” by K-9 Mattie, the police had no further evidence upon which to base probable cause affirmatively to search the vehicle than they had in the CVS parking lot. And McKeon’s earlier lawful “frisk” of the area under the front seat at the CVS lot had come up negative. McKeon’s opening the door and having Bussiere set K-9 Mattie into the interior of the Nissan was a full-blown search. Both McKeon and Bussiere acknowledged as much, as they both used the term “search” to describe what was to be (and what was in fact) done.
At that juncture, though, the North Attleboro police did not have probable cause to believe that narcotics or an illegal weapon were in the Nissan’s interior. Accordingly, the evidence seized pursuant to the search of the area under the driver’s front seat must be suppressed.[5]
ORDER
The defendant’s motion to suppress is ALLOWED.

The Commonwealth initially proceeded on a consent theory, as well as a reasonableness theory, that the warrant-less search at issue was lawful. The primary testimony as to the consent theory was through retired North Attleboro Lt. David Dawes (“Lt. Dawes”). Several hours after Lt. Dawes testified, the Commonwealth informed the Court that it was withdrawing its consent theory and it was stipulating that Lt. Dawes’s testimony be struck. The Court found McKeon to be credible in all respects other than as to certain testimony elicited in support of the Commonwealth’s consent theory.

In general, Berrios was evasive in answering all of the officers’ questions. She repeatedly responded to a question with the question of her own, “What happened?” Only after the officers repeated their questions did she give responsive (but not necessarily truthful) answers.

Nevertheless, as noted, he and Lt. Dawes permitted Berrios to drive the Nissan alone to the station without their having further examined the area under the driver’s seat.

The Court found Bussiere to be credible in all respects.

Drawing a strict line between an exterior dog-sniff inspection of a motor vehicle and an interior dog-sniff inspection is appropriate considering that the SJC’s Feyenord decision approving exterior dog sniffs on reasonable suspicion of drug activity was made with two dissents on the merits (Chief Justice Marshall and future Chief Justice Ireland), 445 Mass, at 90-95, and a concurrence by Justice Greaney, id. at 86-90. Justice Greaney stressed the importance that the majority’s decision be narrowly construed to avoid abuse by law enforcement to target vulnerable groups: “In our democratic society, special concern must be vigilantly exercised by the courts to balance the rights of the police under the principles of Terry v. Ohio... with the protections afforded less powerful citizens who often feel the brunt of Terry-like stops.” Id. at 87.