**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 30 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LAMAR ANTWAUN WILLIAMS,

    Defendant - Appellant.

No. 03-2065

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO
### (D.C. No. CR-01-1335 JP)

---

David N. Williams, Assistant United States Attorney (and David C. Iglesias, United States Attorney, on the brief) Albuquerque, New Mexico, for Plaintiff - Appellee.

Richard A. Winterbottom, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant - Appellant.

---

Before **KELLY**, **McKAY**, and **O'BRIEN**, Circuit Judges.

---

**KELLY**, Circuit Judge.

    Defendant-Appellant Lamar Williams appeals from his conviction of

possession of a controlled substance with intent to distribute, 21 U.S.C. §

841(a)(1) and (b)(1)(A). Prior to his jury trial, Mr. Williams moved to have the physical evidence against him excluded as the fruit of an illegal search and seizure. The district court denied the motion and Mr. Williams now challenges that ruling. Because the physical evidence Mr. Williams seeks to suppress was not the product of an illegal search or seizure, but rather of his own voluntary actions, we affirm.

Background

On the afternoon of September 24, 2001, Mr. Williams arrived at the Albuquerque bus station on a bus from Los Angeles. At Albuquerque all passengers were required to deboard the bus to allow for routine maintenance and cleaning. Accordingly, Mr. Williams left the bus and walked into the bus station. Unbeknownst to Mr. Williams, two Albuquerque police officers, Officer Art Lucero and Detective Anna Griego, and one DEA agent, Mark Hyland, were patrolling the bus station that afternoon for the purpose of interdicting drug traffic. Detective Griego had with her a police dog named Amber, which was trained in the detection of narcotics. None of the three officers were in uniform. Upon entering the station, Mr. Williams initially headed toward the exit leading to the parking lot. At approximately the same time Detective Griego and Amber were entering the bus station through the same door toward which Mr. Williams

was headed. At this point the parties' factual premises diverge somewhat, but it is clear that Mr. Williams changed direction rather abruptly and headed toward the exit leading onto Second Street. Officer Lucero observed this pattern of behavior and conferred with Detective Griego, whereupon the two officers agreed on their desire to speak with Mr. Williams. Approximately ten minutes later, the two officers located Mr. Williams just outside the exit to Second Street. The two officers, along with Amber, approached Mr. Williams. As the trio neared Mr. Williams, Amber apparently sensed an odor worth pursuing and placed her nose in the immediate vicinity of Mr Williams's waist and groin area. Amber then sat down next to Mr. Williams, thus alerting her handler to the likely presence of drugs on the subject.

Mr. Williams asked the officers what their dog was doing. Detective Griego responded that Amber was a drug detection dog. Officer Lucero then requested to see Mr. Williams's bus ticket and identification, and explained that he and Detective Griego were police officers attempting to interdict drug traffic through the bus station. Mr. Williams volunteered that he did not have any drugs and immediately offered the officers permission to search his bag. Officer Lucero searched Mr. Williams's bag, and then asked for permission to conduct a pat-down search of Mr. Williams's person. During this interaction Mr. Williams appeared quite nervous. He began to perspire and moved his hands repeatedly in and out of

his pockets. In apparent compliance with Officer Lucero's request to search his person Mr. Williams began unbuttoning his coat, and then suddenly turned and ran from the officers.

As Mr. Williams fled, he was observed throwing a small gray package onto a roof adjacent to his path of flight. Mr. Williams was apprehended shortly thereafter and was placed under arrest. Officers from the Albuquerque Police Department retrieved the abandoned package, which contained approximately 1.2 pounds of cocaine base.

The district court denied Mr. Williams's motion to suppress finding that the dog alert to the presence of drugs on Mr. Williams's person provided the officers with probable cause to arrest him, and consequently any seizure of Mr. Williams following the initial dog alert was supported by probable cause. Further, the court found that Mr. Williams's subsequent flight from the officers and his attempted disposal of an item while fleeing provided independent probable cause on which to base an arrest.

Mr. Williams now appeals that decision on the basis that the dog sniff of his person constituted a search requiring at least reasonable suspicion, and that he was illegally seized when the officers approached him with the dog. Consequently, Mr. Williams argues that the physical evidence against him is subject to exclusion as the fruit of an illegal search and seizure. See Mapp v. Ohio, 367 U.S. 643, 647-

48 (1961).

Discussion

We review the factual findings of the district court for clear error. United States v. Gandara-Salinas, 327 F.3d 1127, 1129 (10th Cir. 2003). We review the legal conclusions of the district court regarding the legality of any search or seizure de novo. United States v. Lara-Solano, 330 F.3d 1288, 1291 (10th Cir. 2003).

As a preliminary matter, we must address the government's contention that Mr. Williams failed to argue to the district court that the dog sniff constituted an illegal search, and thereby failed to preserve the issue for appeal. See Singleton v. Wulff, 428 U.S. 106, 120 (1976). In such circumstances we may review only for "plain error resulting in manifest injustice." United States v. Chavez-Marquez, 66 F.3d 259, 261 (10th Cir. 1995). As we read the record, however, Mr. Williams did in fact raise this issue below, albeit couched in slightly different terms. Mr. Williams argued that the police require at least reasonable suspicion before they may approach a person with a drug detecting dog. This is essentially the same argument Mr. Williams raises on appeal, namely that a dog sniff constitutes a search and must therefore be supported, at the very least, by reasonable suspicion. Further, although not explicitly included in the district court's legal or factual

findings, this issue was passed upon below. The transcript of the suppression hearing clearly reveals the district court's understanding that the initial meeting between the two officers, Amber, and Mr. Williams was consensual in nature and consequently did not require any degree of suspicion on the part of the officers.

A. Dog Sniff of Person as Search Requiring Probable Cause

Mr. Williams argues that the dog sniff constituted a search requiring at least reasonable suspicion. According to Mr. Williams, when Amber and the officers approached him no such reasonable suspicion existed, and therefore the search was a violation of his Fourth Amendment rights. In support of his position that a dog sniff of a person constitutes a search, Mr. Williams has set forth a rather detailed argument as to why the Supreme Court's holding in Kyllo v. United States, 533 U.S. 27 (2001), should be read as limiting the Court's holding in United States v. Place, 462 U.S. 696 (1983), that a dog sniff of luggage does not constitute a search. As academically interesting a question as that may be, however, we see no need to answer it today.

A party seeking exclusion of evidence on Fourth Amendment grounds must demonstrate both actual police misconduct that violated the defendant's Fourth Amendment rights, and that the evidence to be excluded was in fact a product of the police misconduct. See United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001); United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000) ("The defendant then bears the burden of demonstrating a factual nexus between the illegality and the

challenged evidence.") (internal quotation marks omitted). It is thus incumbent upon a defendant to demonstrate some affirmative link between the police misconduct and the evidence obtained. "At a minimum, a defendant must adduce evidence . . . showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." Nava-Ramirez, 210 F.3d at 1131. Only if the defendant makes both showings does the burden then shift to the government to prove that the evidence is not "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); United States v. Ienco, 182 F.3d 517, 528 (7th Cir. 1999).

Here, Mr. Williams fails to demonstrate any nexus between the allegedly illegal search and the physical evidence obtained by police, nor is any such nexus readily apparent. Had the officers arrested Mr. Williams immediately upon Amber's alert and effected a search of his baggage and person, the issue would be squarely before us. That is not what happened.

Mr. Williams's flight was apparently provoked by Officer Lucero's request to search his person. Such a request need not be supported by any degree of suspicion. Florida v. Royer, 460 U.S. 491, 501 (1983). To the contrary, law enforcement officers may approach a person in a public place and ask questions, request information, or request permission to search without infringing a person's Fourth Amendment rights. See Florida v. Bostick, 501 U.S. 429, 434 (1991); United States v. Mikulski, 317 F.3d 1228, 1234 (10th Cir. 2003). Mr. Williams claims, however, that the right of law enforcement

officials to approach an individual in a public place without suspicion does not include the right to do so with a drug sniffing dog in tow. Once again, because the dog's presence produced no evidence we need not address that contention today.

In short, Mr. Williams cannot demonstrate that but for the dog sniff, the officers would not have discovered the drugs. The officers' suspicions were first aroused not by the dog alert, but by Mr. Williams's apparently evasive movement upon entering the bus station. The officers decided to approach him long before Amber ever alerted to the presence of drugs on his person. Mr. Williams's argument must therefore hinge on the assertion that but for the dog sniff the officers would not have requested to search his person. This argument fails both as a matter of law and fact. First, even if the police were motivated to request permission to search by information gleaned through an illegal search, such conduct does not fall afoul of the Fourth Amendment. United States v. Carson, 793 F.2d 1141, 1149 (10th Cir. 1986) ("While the police may exert coercion in the manner in which they request defendant's consent, the request itself, even if motivated by the fruits of the prior illegality, is not exploitation.").

Furthermore, such an assertion is unsupported by the district court's factual findings. First, it was Mr. Williams, not the officers, who initially proposed the idea of a search, both verbally and by presenting his bag to the officers. Mr. Williams's apparent nervousness during the search of his bag and his questioning of the officers further piqued their suspicion. Finally, it cannot be said that Mr. Williams's nervousness was prompted

by the fact that the dog had alerted to him, as he was most likely unaware of that fact. See United States v. Sheppard, 901 F.2d 1230, 1234-35 (5th Cir. 1990). In sum, at the time the officers made the decision to request permission to search Mr. Williams's person, the fact that the dog had alerted made little or no difference in that decision; certainly it cannot be said that but for the dog sniff the officers would not have requested a search of Mr. Williams's person. Thereafter, it was Mr. Williams's voluntary abandonment of the package, as prompted by the request to search his person, rather than the dog sniff, that provided police with the physical evidence of Mr. Williams's criminal activity. See United States v. Boone, 62 F.3d 323, 326 (10th Cir. 1995) ("In the absence of subsequent illegal conduct, we cannot find that the Defendants' decision to throw bottles of PCP out the window of their car was the product of [the] illegal car search."). Once Mr. Williams abandoned the package in the course of his flight, he ceded any expectation of privacy in that package. There is no Fourth Amendment interest in abandoned property. See United States v. Hernandez, 7 F.3d 944, 947 (10th Cir. 1993).

B. At No Point Prior to his Flight was Mr. Williams Seized

Mr. Williams further argues that the evidence against him should be suppressed as the product of an illegal seizure. Specifically, Mr. Williams contends that when the two officers, along with Amber, approached him outside the bus terminal, this constituted a seizure because a reasonable person would not have felt free to terminate the encounter. As noted, law enforcement officers may approach an individual and request information

without implicating the Fourth Amendment, so long as the encounter is consensual in nature. United States v. Drayton, 536 U.S. 194, 200-01 (2002). Once a reasonable person would not feel free to terminate the encounter, however, the encounter is transformed into a seizure requiring at least reasonable suspicion. See Florida v. Bostick, 501 U.S. 429, 434 (1991).

Though the ultimate issue is whether a reasonable person would feel free to terminate the encounter, a number of factors may be considered in making that determination. As the Supreme Court explained in United States v. Mendenhall, 446 U.S. 544, 554 (1980), "Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance . . . might be compelled." In Mr. Williams's case, all of these indicators of a seizure were conspicuously absent. The encounter occurred in a relatively open space; Mr. Williams's path of egress from the officers was at no time impeded. See United States v. McCranie, 703 F.2d 1213, 1217 (10th Cir. 1983). None of the officers were uniformed, nor did they at any time display a weapon. In short, there is no indication that a reasonable person in Mr. Williams's position would not have felt free to terminate the encounter with the police.

Mr. Williams argues, however, that the dog sniff of his person distinguishes this case because the dog sniff itself constituted an illegal detention, and that the illegal

detention continued as the officers questioned him. Specifically, Mr. Williams claims that Amber's obvious alert to the presence of drugs on his person tainted his consent to speak with the officers and his subsequent consent to the search of his bag. Mr. Williams's argument here is akin to an assertion that the accusatory tone of police questioning transformed an otherwise consensual encounter into a seizure.

It is undoubtedly true that a consensual encounter between a citizen and police can be transformed into a seizure through persistent and accusatory questioning by police. See United States v. Ringold, 335 F.3d 1168, 1174 (10th Cir. 2003); United States v. Little, 60 F.3d 708, 712-13 (10th Cir. 1995). The question then becomes whether Amber's behavior, or that of either of the officers, was sufficiently accusatory in nature to make a reasonable person feel they were unable to terminate the encounter. Bostick, 501 U.S. at 434. Amber's behavior towards Mr. Williams consisted of sniffing his waist and groin area and then seating herself next to him. Although such behavior may be disconcerting to one who knows himself to be in the possession of drugs, it must be remembered that the benchmark for purposes of the Fourth Amendment is the perception of an innocent person. See id. at 438. ("The 'reasonable person' test presupposes an *innocent* person."). We hold that a reasonable innocent person in these circumstances would not feel sufficiently accused by such behavior to transform the encounter into a seizure. It follows that Mr. Williams had not been seized at the time of his flight from the officers, and consequently the package of illegal drugs he abandoned during his flight

was not the product of an illegal seizure. See United States v. Flynn, 309 F.3d 736, 738-39 (10th Cir. 2002) (holding abandonment of drugs voluntary because, though warned of a police drug checkpoint ahead, defendants had not yet been stopped by police); see also California v. Hodari D., 499 U.S. 621, 625 (1991) (no seizure occurs where subject does not submit).

The dissent reasons that Mr. Williams was seized because the drug dog sniffed and alerted and an officer (in response to Mr. Williams' inquiry) explained that the dog was part of a drug interdiction effort. At that point, Mr. Williams volunteered that he had no drugs and offered the officers permission to search his bag. Far from wishing to terminate the encounter, Mr. Williams was responsible for prolonging it. Although one sentence in Mr. Williams' brief argues that "[t]he sniff search constituted an illegal detention that continued as the officers questioned Mr. Williams," Aplt. Br. at 35, the focus of the argument here and in district court has always been that the sniff constituted a search requiring individualized suspicion.

The dissent's observation that "one would feel more restrained than if the officers had their guns drawn" does not bring to mind an objectively reasonable person. No record evidence suggests that these drug dogs have inflicted harm, and it is pure speculation to suggest otherwise on this record. The dissent's allusions to Sixties civil rights protests, and to the San Francisco woman mauled to death by her neighbor's dogs (simply irrelevant) cannot substitute for evidence. Although the dissent contends that the

"reasonable person" construct "come[s] from the minds and experience of judges, not from the record," such a determination has always depended upon the record facts concerning the police conduct at issue, not what a court imagines that conduct to be.  See Kaupp v. Texas, 123 S. Ct. 1843, 1845 (2003) (per curiam) (seizure of person occurs when taking into account *all of circumstances surrounding encounter*, police conduct would have communicated to a reasonable person that he was not free to leave).

AFFIRMED.

No. 03-2065, *United States v. Williams*

**McKAY**, Circuit Judge, dissenting:

As the majority notes, when the officer and the dog first approached Mr. Williams, the dog

> placed her nose in the immediate vicinity of Mr. Williams's waist
> and groin area. [The dog] then sat down next to Mr. Williams, thus
> alerting her handler to the likely presence of drugs on [Mr.
> Williams].
> Mr. Williams asked the officers what their dog was doing.
> Detective Griego responded that [the dog] was a drug detection dog.
> Officer Lucero then requested to see Mr. Williams's bus ticket and
> identification, and explained that he and Detective Griego were
> police officers attempting to interdict drug traffic through the bus
> station.

Maj. Op. at 3. At that point, Mr. Williams stated that he did not have any drugs and gave

the officers permission to search his bag. Officer Lucero searched Mr. Williams's bag

and then asked him if he could do a pat-down search of his person. In apparent

compliance with Officer Lucero's request, Mr. Williams began unbuttoning his coat, but

then he suddenly turned and ran. As he fled, he threw a small gray package onto a roof.

Shortly after this, Mr. Williams was apprehended and arrested. Officers then retrieved

the package, which contained approximately 1.2 pounds of cocaine base.

The majority's flat assertion that "a reasonable innocent person in these

circumstances would not feel sufficiently accused by such behavior to transform the

encounter into a seizure," Maj. Op. at 11, is contrary to my judgment about a reasonable

person. These drug dogs are not lap dogs. They typically are large, and to many ordinary

innocent people, fearsome animals. For decades, the images of the Sixties civil rights'

protests have impressed on our collective awareness the image of similar dogs, with

handlers holding their leashes, viciously attacking innocent protesters. This public

consciousness is reenforced by reports of leashed dog attacks like the one involved in the

recent nationally-tracked conviction of a California lawyer whose leashed dog killed her

innocent neighbor in the hallway of their apartment building. Television news reports of

police dogs being used to subdue suspects are common.

When, as in this case, a drug dog shoves its nose in a person's groin, and the

person is told that the dog is searching for drugs, the notion that an innocent person would

not feel constrained–but free to leave unmolested–strains my credulity. It seems to me

that one would feel more restrained than if the officers had their guns drawn. Indeed, the

frequent use of police dogs rather than guns tends to confirm the collective police

judgment about the relative difference in intimidating effect. Add to that the real

possibility that the presence of a few $20 bills in an innocent person's pocket could

produce a positive drug dog response, and I cannot but conclude that this encounter

matured into a seizure before the defendant fled.

The differing judgments about the response of the judicially defined "innocent"

person also has implications for the issue we do not reach–whether an individualized drug

dog sniff of one's person constitutes a search. But it is sufficient for present purposes to

note that my sense of "*reasonable* expectations of privacy" indicates that a search dog

sniffing the groin of a person is much more unreasonable than the passive use of thermal imagery on one's house.  See generally Kyllo v. United States, 533 U.S. 27 (2001).  At the very least, before we declare such encounters  "reasonable," or free from seizure implications, we ought to be informed of how widespread the fear of dogs, far short of cynophobia, is among reasonable and innocent persons.  While the "reasonable person" and the "innocent person" are legal fictions created by the courts, before we settle the matter, we ought at least to examine what can be known of common human behavior before we ratify police dog handler behavior which on its face seems repugnant.

The majority misses the point by dismissing the above comments as not grounded in the record.  The comments are specifically directed to the majority's assertions about what a "reasonable person" would do.  The reasonable person of our case law has historically come from the minds and experience of judges, not from the record.

I would hold that there was a seizure, unsupported by reasonable suspicion, and that the subsequent drug discovery was the fruit of that unlawful seizure.