**[J-70-2019] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

COMMONWEALTH OF PENNSYLVANIA,

        Appellee

        v.

HAROLD COST,

        Appellant

: No. 39 EAP 2018
:
: Appeal from the Order of Superior
: Court entered on June 11, 2018 at
: No. 1567 EDA 2017 reversing the
: Order entered on April 20, 2017 and
: remanding to the Court of Common
: Pleas, Philadelphia County, Criminal
: Division at No. CP-51-CR-0009310-
: 2015.
:
: ARGUED: September 11, 2019

## CONCURRING OPINION

**JUSTICE WECHT**                               **DECIDED: January 22, 2020**

In determining whether a citizen's interaction with a police officer constitutes a mere encounter or is instead an investigative detention, which requires that the officer have reasonable suspicion of criminality,[1] this Court has followed the United States Supreme Court in asking whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *accord Commonwealth v. Livingstone*, 174 A.3d 609, 619 (Pa. 2017). Pursuant to this "objective" test, only where "the officer,

---

[1] *See Reid v. Georgia*, 448 U.S. 438, 440 (1980) ("While the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."); *accord Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014).

'by means of physical force or a show of authority,' has restrained a citizen's freedom of movement"—or rather whether a reasonable person, innocent of any crime, would so conclude—must the detaining officer establish that the detention was supported by particularized suspicion. *Livingstone*, 174 A.3d at 619; *see Commonwealth v. T. Jones*, 378 A.2d 835, 839-40 (Pa. 1977).

Concurring in the Superior Court's decision in *Commonwealth v. Lyles*, 54 A.3d 76 (Pa. Super. 2012), which this Court later affirmed,[2] Judge Strassburger commented pointedly on the "objective" reasonable-person test that courts apply in determining when a "mere encounter" escalates to an "investigative detention" requiring reasonable suspicion:

> [T]he case law has developed into an Alice in Wonderland scenario, as judges attempt to determine if an individual is or is not free to leave.
>
> When a police officer initiates an encounter, an individual as a practical matter **never** feels free to leave. The police officer has a weapon. The police officer's testimony is almost always believed in court. No responsible person would walk away from an encounter with a police officer.
>
> Lawyers, judges and law professors can debate the niceties as to whether an individual is legally free to leave, but the case law does not comport with reality.

*Id.* at 84 (Strassburger, J., concurring) (emphasis in original).

Judge Strassburger's skepticism was hardly novel in Pennsylvania and elsewhere. Just months earlier, in *Commonwealth v. Au*, 42 A.3d 1002 (Pa. 2012), this Court acknowledged "the conceptual difficulties inherent in the administration of the reasonable-person standard," elaborating:

> Although the test is cast in objective terms, . . . there remains substantial room for reasonable disagreement concerning how such a hypothetical

---

[2] *See Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014).

person might feel in any given set of circumstances. Such differences have been manifested, at both the federal and state level, in many divided opinions on the subject. Nevertheless, the High Court has settled on an approach allocating very modest weight to the possibility for psychological coercion arising from a fairly wide range of police conduct which may be regarded as being appropriate to and inherent in the circumstances facilitating the interaction.

*Id.* at 1007-08 (cleaned up).[3] Notably, though, neither then nor since has the United States Supreme Court applied such "modest weight" to circumstances in which a police officer takes a subject's identification and retreats to conduct a background check on that individual,[4] and the Majority, correctly holds that an officer taking an individual's identification and "proceed[ing] to do with it as he wishe[s]" is "a substantial escalating factor in terms of the assertion of authority." Maj. Op. at 18-19.

In this Court's decision affirming the Superior Court's ruling in *Lyles*, the Majority explained that Judge Strassburger's apt observation that the test "does not comport with reality" is why "subjective beliefs are not determinative." *Commonwealth v. Lyles*, 97 A.3d 298, 301 (Pa. 2014). Thus, this Court openly acknowledged that the reasonable-person

---

[3]     Similarly, this Court more recently observed:

[U]pon consideration of the realities of everyday life, particularly the relationship between ordinary citizens and law enforcement, we simply cannot pretend that a reasonable person, innocent of any crime, would not interpret the activation of emergency lights on a police vehicle as a signal that he or she is not free to leave.

*Livingstone*, 174 A.3d at 621.

[4]     The Court has held generally that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (citing *Florida v. Royer*, 460 U.S. 491, 501, 523 n.3 (1983) (plurality; opinion of Rehnquist, J., respectively)). But the Court has not specifically addressed the scenario where the identification is retained while an officer runs a background check.

test is, perhaps by design, more efficacious than it is realistic. Put simply, in identifying as "reasonable" a belief that few if any people actually hold, the governing standard protects police from the strictures that would apply were courts to embody the reality of citizen-police interactions in constitutional doctrine. This may be desirable as a practical matter, but we must proceed with a caution informed by lived experience if we are to honor the Fourth Amendment's protections in the breach; constitutional protections cannot yield to convenient fictions. A reasonable-person test that seeks to balance real-world experience with the practical need to "allocat[e] very modest weight to the possibility for psychological coercion arising from a fairly wide range of police conduct," *Au*, 42 A.3d at 1008, is not unwarranted, undesirable, or unattainable.

The reasonable-person standard does no good when it vindicates constitutional rights conferred only upon figments of the judicial imagination. *Cf. United States v. Williams*, 356 F.3d 1268, 1276 (10th Cir. 2004) (McKay, J., dissenting) ("The reasonable person of our case law has historically come from the minds and experience of judges, not from the record."). Imaginary individuals do not suffer constitutional violations at the hands of law enforcement officers who overstep; the price is paid by people of flesh and blood. Most such people, in most police-initiated encounters, do not feel free to leave, and our law succeeds in giving effect to the Fourth Amendment's protections only to the extent that it reflects reality. For this reason, I respectfully differ with the Majority's characterization of the case *sub judice* as "a close one." Maj. Op. at 22.

While the Majority relies principally on federal law and a limited review of extra-jurisdictional precedent, the lower courts and the parties have relied heavily upon competing interpretations of our decisions in *T. Jones*, *Au*, and *Lyles*, *supra*. Indeed,

*Lyles* contained *dicta* alluding to the prospect of a case such as this one.[5] Notably, in neither *Au* nor *Lyles* did the officer in the encounter proceed past preliminary inquiries before his observations of the subjects' behavior interceded to justify the custodial detentions that followed. Any suspicionless investigative intention on the part of the officers, and the prospect of an investigative detention, was interrupted by the abrupt emergence of observations or behaviors that clearly warranted more probing investigation—in both cases before the officer had even expressed the intent to run background checks, let alone commence that process. In *Au*, before the defendant even handed his identification to the inquiring officer, marijuana came into the officer's plain view. *See Au*, 42 A.3d at 1003-04. In *Lyles*, the subject's repeated furtive movements while the officer held the subject's identification and recorded his personal information on paper prompted the investigating officer to seize the subject. *See Lyles*, 97 A.3d at 300.

Thus, among this Court's decisions, only *T. Jones* involved retention of the subject's identification and a background check. Indeed, in *T. Jones* the encounter shared material characteristics with the encounter in this case. There, the officer stopped Jones on nothing more than a hunch. After twice observing Jones on foot on separate highways moving in different directions, the officer approached Jones and engaged him in conversation. *T. Jones*, 378 A.2d at 837-38. The ensuing encounter did not involve an aggressive show of authority, and it occurred in the open and in broad daylight.

---

[5]      *See Lyles*, 97 A.3d at 306 (An officer briefly retaining appellant's identification while he recorded identifying information "did not restrain appellant's freedom of movement. The officer did not question appellant further while he was holding the identification, and he did not use appellant's information to run a background check.").

However, the officer asked for and retained the defendant's identification, asked the defendant to sit in the car, and conducted a warrant check.

We explained the familiar test as follows:

> To determine when a stop has occurred . . . all of the circumstances which may in any way evidence a show of authority or exercise of force including such subtle factors as the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements must be examined.

*Id.* at 839-40 (cleaned up). In that case, notwithstanding the lack of an aggressive assertion of authority, we nonetheless noted that "the entire situation show[ed] not only an exercise of force but also an escalation in that exercise." *Id.* at 840.

> [The officer] approached Jones on a highway in a marked car and in uniform and addressed questions to him. In doing so, he did not merely ask Jones his name; rather, he immediately sought identification from Jones, and, when Jones complied he escalated the exercise of force by asking Jones to be seated in the car. This latter request was not merely an attempt to obtain information; rather, while stated as a question, it sought control of Jones' movement.

*Id.*

In the instant matter, Cost and his cohort were not asked to sit in a police car. However, as in *T. Jones*, they were asked at the outset of the encounter, which occurred well into the evening in what the officers characterized as a "high-crime neighborhood,"[6]

---

[6]     The officers' subjective perceptions and unstated intentions—for example, the frequency of criminality in the area or whether the officers would have allowed Cost or his companions to leave had they chosen to do so—are immaterial to the detention analysis. *See Lyles*, 97 A.3d at 304-06. That being said, because the reasonable-person test requires us to consider the totality of the circumstances in assessing whether a reasonable person would feel free to leave, whether the neighborhood in which a given encounter occurs is a high-crime neighborhood that is heavily policed certainly militates against finding a mere encounter. *Cf. Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) ("[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also *with*

to produce identification, which one of the officers then used to feed information by radio to other police personnel to conduct a background check. Under governing case law, merely requesting and reviewing identification does not rise to the level of asking Cost and the others to sit in a police vehicle. But once their proofs of identification were removed from their immediate grasp and the police "ran" them over the radio, the real-life effect was to restrain them.[7] The question, then, is whether that real-life effect is one that we also should impute to a hypothetical reasonable person.

As the Majority notes, many courts already have acknowledged that walking away from one's identification with no assurance that it will be returned ensures tremendous difficulty on the part of the individual so deprived to later recover or replace that identification or to conduct any number of daily activities without one. *See* Maj. Op. at 16. In this regard, the Tennessee Supreme Court, in finding an investigative intention based more or less exclusively upon an officer's retention of a subject's identification and

---

*the setting in which the conduct occurs.*" (emphasis added)). There can be little doubt that individuals in such neighborhoods are especially hesitant to disregard police inquiries, and with good reason, given the atmosphere of official suspicion as well as dragnet investigative tactics that prevail in some such neighborhoods. *See Utah v. Strieff*, 136 S. Ct. 2056, 2069 (2016) (Sotomayor, J., dissenting) (noting cases identifying jurisdictions that employed "stop-and-frisk" tactics and warrant checks on subjects of police interest without reasonable suspicion, including *Ligon v. New York*, 925 F.Supp.2d 478 (S.D.N.Y. 2013), and *State v. Topanotes*, 76 P.3d 1159 (Utah 2003)).

[7]     The Majority notes that the Commonwealth first disputes that the officer "running" the identifications over the radio stepped away from Cost and his companions and further disputes that calling in the identifications was for purposes of a "background check." *See* Maj. Op. at 14. I agree with the Majority that the paucity of evidence to support the Commonwealth's contention that the officer did not step away must weigh in favor of Cost's contrary account. *See Id.* at 14-15. Like the Majority, I also reject any suggestion that there is some distinction between merely radioing in Cost's identifying information and conducting a background or warrant check. *Id.* at 15 n.9.

conduct of a warrant check, has observed that the subject was detained because "[a]bandoning one's identification is simply not a practical or realistic option for a reasonable person in modern society." *State v. Daniel*, 12 S.W.3d 420, 427 (Tenn. 2000); *see United States v. Jordan*, 958 F.2d 1085, 1087 (D.C. Cir. 1992) (citing *Royer*, 460 U.S. at 501-02) ("Once the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee it is difficult to imagine that any reasonable person would feel free to leave without it." (cleaned up)); *cf.* Maj. Op. at 19 (noting that a plurality of the Court in *Royer,* 460 U.S. at 498, expressed the view that citizens "may not be detained even momentarily without reasonable, objective grounds for doing so").[8]

As in our *T. Jones* decision, in this case the retention of identification was not an idle exercise, but facilitated further investigation into the individuals in question, unmistakably signaling to Cost a baseline level of suspicion regarding his legal status and current activities. In my view, the combined circumstances of taking someone's identification and retaining it while running a background check and the suspicion such

---

[8]    It is worth remembering that an identification card also is personal property—and, at that, personal property far more difficult to replace than many mere possessions, given the distinction between, for example, visiting a department store to obtain new clothing and visiting a government office to obtain a replacement driver's license. Relatedly, the Supreme Court has questioned whether a reasonable person feels free to leave when he has surrendered *any* personal property to police for investigative purposes. In *United States v. Place*, 462 U.S. 696 (1983), for example, the Court held that retaining an air traveler's luggage for ninety minutes at his destination airport violated his Fourth Amendment rights, especially where the detaining agents did not inform the subject where they were taking the luggage or how long they intended to hold it, even though there was no dispute that he was free to leave while the police continued their investigation. The Court also held that, notwithstanding the lack of a coercive environment or detention of the person, the seizure of luggage could "effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return." *Id.* at 708.

events necessarily bespeak, suffice to establish an investigative detention. Running a background check is no different than asking the individual point-blank whether he or she has any outstanding warrants. It is, by its very nature, investigative, echoing one of the two factors that comprise an "*investigative* detention," signaling that the officer believes the background check may well return an outstanding warrant. *See A. Jones v. United States*, 154 A.3d 591, 596 (D.C. 2017) ("[A] reasonable person who can tell from the inquiries that the officer suspects him of something, and who cannot know whether the officer thinks there is sufficient reason to detain him, may well doubt that the officer would allow him to avoid or terminate the encounter and just walk away."). Dispossessed of his identification and thus detained as a practical matter, and aware that the officer deems him worthy of official investigation, *any* reasonable person worthy of that description would conclude that he was "detained" for "investigative" purposes; that is to say, no reasonable person, would feel free to leave under such circumstances.[9]

In this regard, the Majority observes that, "while [Cost] maintains the Court should recognize as a 'general rule' that persons in these circumstances will not reasonably feel free to terminate the encounter, . . . [he] stops short of advocating in favor of a *per se* approach." Maj. Op. at 13. To say that courts must consider the totality of the

---

[9] *See Ramsey v. United States*, 73 A.3d 138, 147-48, 148 n.19 (D.C. Ct. App. 2013) (holding that the running of a background check by itself converted a mere encounter into an investigative detention and collecting cases); *see also United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir. 1983) (holding that mere questioning and request for the subject's license and airline ticket did not trigger an investigative detention, but that it became a detention when one officer handed the license and ticket to another and informed the subject that the officers were conducting a narcotics investigation); *United States v. Waksal*, 709 F.2d 653, 660-62 (11th Cir. 1983) (finding investigative detention where officers retained airplane ticket and license and asked subject to accompany them to a nearby office); Brief for Cost at 46-50 n.7 (collecting cases).

circumstances—a proposition I do not propose to disrupt[10]—is not to say that no particular circumstance must require the same result in every case; to the contrary, finding that certain facts measured against certain legal principles will in every instance require the same result is the essence of *stare decisis*, and a foundational principle of the common law. *See In re Roca*, 173 A.3d 1176, 1187 (Pa. 2017). One may call this a "general," "categorical," or "*per se*" rule according to one's preference, but the difference is more semantic than substantive.

To illustrate the point, I sincerely doubt that the Majority would find any set of circumstances in which police officers handcuffed an individual and closed him into the back seat of their squad car constituted a "mere encounter" rather than an "investigative detention." It would not affect the outcome whether the officers had used an "authoritative" or pleasant tone of voice, or withdrawn their firearms or stood at ease, factors that may make the difference in closer cases. But that does not state a *per se* rule as that term typically is used in the law. It merely acknowledges that when a certain circumstantial threshold is crossed, no further inquiry is required because no reasonable person, however parsimoniously defined, would imagine himself free to leave under such circumstances.

As one commentator cited by the Majority has it, in this area of the law "the standard of permissible intimidation is quite high." *See* Maj. Op. at 21 n.15 (quoting David

---

[10] The Majority's citations of *United States v. Banks*, 540 U.S. 31 (2003), and *Ohio v. Robinette*, 519 U.S. 33 (1996), for that general proposition do not undermine my circumstance-specific view of this case or its implication for the broader run of cases presenting substantially similar interactions. They merely comment upon the challenging interplay of "reasonableness" and totality of the circumstances elements of the governing standard that repeatedly has engendered comment from this Court, *see Au, supra*, and animates my present disagreement with the Majority.

T. McTaggart, *Reciprocity on the Streets: Reflections on the Fourth Amendment & the Duty to Cooperate with the Police*, 76 N.Y.U. L. Rev. 1233, 1249 (2001)). That may, and perhaps must, be the case, but that only goes so far. In *Daniel*, the Tennessee Supreme Court observed that, "when an officer retains a person's identification for the purpose of running a computer check for outstanding warrants, no reasonable person would believe that he or she could simply terminate the encounter by asking the officer to return the identification." *Daniel*, 12 S.W.3d at 427. I agree, and I believe it best serves the interests of clarity in the law to join that court and the others which have incorporated that common-sense principle into their application of the Fourth Amendment to circumstances like those presented in this case.[11]

Against this backdrop, the fact that one officer asked whether the men had anything in their possession that he "need[ed] to know about," Notes of Testimony, 4/20/2017, at 11, 32-33, while the other ran Cost's and his cohort's identifications, is superfluous.[12] I agree with the Majority that such questioning, especially absent any

---

[11] The Majority cites *State v. Pollman*, 190 P.3d 234, 240 (Kan. 2008), for the more hedged proposition that an officer taking a subject's identification is a relevant *factor* in determining whether an investigative detention has occurred, "and may, *absent offsetting circumstances*, mean a reasonable person would not feel free to leave without his or her license" (emphasis added by the Majority). *See* Maj. Op. at 18. Notably, neither *Pollman* nor the cases *Pollman* cites elaborate on what hypothetical offsetting circumstances might suffice to convince a reasonable person that, relieved of his identification and aware that a police officer has decided that it is worth the effort to determine whether he is a wanted man, nonetheless may leave at his pleasure—let alone do so when it means abandoning his identification.

[12] The same is true of whether the officers adopted a "field stance." However, the Majority's recitation of the relevant testimony and the standard of review makes clear that the inference that the officers adopted such a stance in this case, and that officers adopting that stance in locations that effectively bracketed an individual, militate in favor of the conclusion that an investigative detention occurred. *See generally* Maj. Op. at 3 (citing testimony). Furthermore, I find both curious and erroneous the Superior Court's

suggestion that the officer asked out of concern for his safety, also implies an investigative intent and militates in favor of finding an investigative detention. *See* Maj. Op. at 18 ("[W]e agree with [Cost] that repeated queries whether there is anything that a police officer 'need[s] to know' about within a person's possessions suggests some authoritative right to know . . . ."). Indeed, I believe that such an inquiry standing alone substantially escalates the character of an encounter. A reasonable person would construe such an inquiry to refer to one or both of two things: weapons, possessed legally or illegally, that may present a threat to the officer; or contraband. Either interpretation signals an investigative motive for the questioning and a degree of suspicion that the subject is engaged in criminality, as does running a warrant check or inquiring as to why the subject is where he is, his present activities, or his intentions.

If case law has reached unrealistic results, or has created a framework in which such results might occur, it has done so by allowing for a blinkered view of how a reasonable person may perceive a given interaction, which risks tipping the balance too far toward negating any realistic sense of reasonableness and thus stripping the test of its putatively defining feature. Nothing intrinsic to the objective test, nor anything in the United States Supreme Court's applications of that test to date, necessitates disregarding the reality of citizen-police interactions.[13]

_____

rejection of this finding simply because the trial court did not expressly cite this factor in Cost's favor. *Id.* at 11 (citing *Commonwealth v. Cost*, 1567 EDA 2017, 2018 WL 2773251, at *5 (Pa. Super. June 11, 2018)). The testimony was of record; by clear implication it militated in favor of Cost's argument; and so the Superior Court departed from its standard of review in suggesting that only the trial court's explicit recitation of that aspect of the case would have rendered it material to the analysis on appeal.

[13] I lay nothing "entirely at the feet of this Court." Maj. Op. at 20. Indeed, I find no obvious fault in *T. Jones*, *Au*, and *Lyles*, as far as they go, nor with the Majority's primary

Courts must take care, it is true, to reserve some measure of investigative discretion for police who view the streets they patrol through the gimlet eyes of long and difficult experience. But we cannot lose sight of how such interactions feel even for privileged, legally informed individuals who find themselves the subject of uninvited police interest, let alone for the vast majority of individuals who lack such information and navigate the considerably more fraught environments in which such encounters are more prevalent. We must strive to ensure that the hypothetical reasonable person against whom we measure constitutional rights is recognizable as such to real people in the real world.

Justice Donohue joins this concurring opinion.

---

analysis in this case, except insofar as it perceives this case to be "closer" under the governing standard than I do. The gap between the "reasonable person" courts invoke for Fourth Amendment purposes and what we know to be true of reasonable, innocent people in the world has been acknowledged in numerous other jurisdictions. As set forth above, this Court, too, noted the discrepancy in *Lyles*.